## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COASTAL CONSERVATION ASSOCIATION, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO: 15-1300** |
| **UNITED STATES DEPARTMENT OF COMMERCE, ET AL** | **SECTION: "H"(3)** |

### ORDER AND REASONS

Before the Court are a Motion for Summary Judgment filed by Plaintiffs (Doc. 35), a Motion for Summary Judgment filed by Defendants (Doc. 42), and a Motion for Summary Judgment filed by Intervenor Defendant (Doc. 45).  For the following reasons, Plaintiffs' Motion is DENIED, and Defendant and Intervenor Defendant's Motions are GRANTED.

### STATUTORY FRAMEWORK

Before addressing the merits of these motions, a brief background of the statutory scheme governing this dispute is helpful.  This dispute centers on the management of the red snapper fishery in the Gulf of Mexico.  This fishery,

1

along with fisheries nationwide, is regulated pursuant to the Magnuson-Stevens Act (the "MSA").  The MSA was passed by Congress in 1976 for the purpose of, inter alia, conserving and managing fishery resources nationwide.[1] To accomplish this goal, the MSA established eight Regional Fishery Management Councils, each tasked with preparing Fishery Management Plans ("FMPs") to address conservation and management of fisheries under their control.[2]  The Councils are empowered to draft FMPs that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery."[3]  The Gulf Council is one such regional council, with authority to manage fisheries in the federal waters of the Gulf of Mexico off the coasts of Texas, Louisiana, Mississippi, Alabama, and Florida.

The Act requires the Councils to form their fishery management plans through a process of notice-and-comment rulemaking.  FMPs are proposed by the Regional Councils, with final regulations promulgated by the Secretary of Commerce through the National Marine Fisheries Service ("NMFS").[4]  The Secretary and the NMFS have limited discretion in choosing to adopt or reject FMPs approved by the Regional Councils; however, the decisions of the

---

[1] 16 U.S.C. § 1801(b)(1).

[2] *Id.* at § 1852(h)(1).

[3] *Id.* at § 1853(a)(1)(A).

[4] *See Campanale & Sons, Inc. v. Evans,* 311 F.3d 109, 111 (1st Cir. 2002).  The NMFS is a division of the National Oceanic and Atmospheric Administration ("NOAA"), which is in turn a division of the Department of Commerce.

Councils are without regulatory effect until the NMFS acts.[5]  Once the Secretary, through the NMFS, reviews the plans and publishes the final regulations in the Federal Register, they have the full force of law.[6]

Any Fishery Management Plan ("FMP") must be consistent with ten National Standards, codified at 16 U.S.C. § 1851(a).  Three of these standards are relevant to the instant litigation:

> (2) Conservation and management measures shall be based upon the best scientific information available.
>
> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.
>
> (8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2),[7] in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

---

[5] 16 U.S.C. § 1854.

[6] *Id.*

[7] National Standard 2 requires that all "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

In addition to the National Standards, the management of Gulf of Mexico red snapper is addressed specifically in section 407 of the Act. This section requires that any FMP for the red snapper fishery adopted by the Gulf Council must "establish separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing) and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year."[8]

## FACTUAL BACKGROUND

Plaintiffs object to Defendants' enactment of Amendment 40 to the Gulf of Mexico Fishery Management Council's Reef Fish Fishery Management Plan and the associated Rule setting fishing quotas and seasons for 2015–2017. Plaintiffs include the Coastal Conservation Association ("CCA")[9] and three of its members: Charles Caplinger, Adam Guillary, and George Huye. Defendants include the United States Department of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service (the "Federal Defendants"). The Charter Fisherman's Association, an organization of charter-for-hire businesses, intervened as a defendant in this matter.

---

[8] 16 U.S.C. § 1883.
[9] Coastal Conservation is a non-profit national association of recreational anglers with 120,000 members in 17 states.

The Gulf Council has managed the red snapper fishery for more than three decades.  Throughout that period, the Council and the NMFS have directed their efforts toward rebuilding the fishery through the use of various management methods.  Prior to 1997, the recreational red snapper season was open year-round in federal waters.  The NMFS subsequently implemented an in-season monitoring and closure process within the recreational sector to conform landings to quotas established under rebuilding targets then in effect. From 2000 to 2007, due to a regulatory amendment replacing the system of in-season monitoring and closure projections with a fixed season based on a preseason projection of when the recreation quota would be reached, the recreational season remained open for 194 days.  Following the adoption of a revised rebuilding plan, the 2008 season marked the beginning of a pattern of markedly shortened recreational red snapper seasons.  This rebuilding effort has been complicated by state seasons that are much longer and have higher bag limits than their federal counterpart.  As a further component of management efforts, federal for-hire permits have been under a moratorium since 2004, and federal permit holders have been prohibited since 2009 from fishing in state waters when federal waters are closed.  Despite these efforts, the total snapper catch exceeded the recreational quota each year except 2010.[10]

Amendment 40 comes as an attempt to reign in the consistent overages in the recreational sector by providing for increased flexibility in the

_____

[10] AR Doc. 230.

management of the sector.  It divides the recreational sector into two components: a federal for hire component comprised of charter fisherman holding federal permits and a private angling component, which includes private anglers and state-licensed charter fishermen.[11]  The final rule allocates the recreational red snapper quota between the two components and provides for separate season closures for the two components.[12]  It allocates 42.3 percent of the recreational quota to federally licensed charter fishermen and 57.7 to the remaining recreational fishermen.[13]

CCA asserts that its members will be harmed by Amendment 40 because it will reduce the maximum quantity of red snapper that individual recreational fisherman can catch.  Plaintiffs, the Federal Defendants, and the Intervenor-Defendants have each filed Motions for Summary Judgment in this matter.

## LEGAL STANDARD

Under the Magnuson-Stevens Act, regulations promulgated by Secretary of Commerce under the MSA are only subject to judicial review on specific grounds set forth in the Administrative Procedures Act ("APA").[14]  The APA states, in pertinent part:

---

[11] Amendment 40, 80 Fed Reg. 22422 (April 22, 2015) (to be codified at 50 C.F.R. pt. 622).

[12] *Id.*

[13] *Id.*

[14] 16 U.S.C. § 1855(f)(1).

6

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;[15]

The Fifth Circuit has mirrored this language, finding that courts should only overturn rules pursuant to the APA if agency action "is arbitrary, capricious, and abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."[16]

The Court must also be mindful of the two-step process of judicial review of agency action outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[17]   Pursuant to *Chevron*, a court reviewing an agency's construction of a statue must first ask "whether Congress has directly spoken to the precise question at issue."[18]  If Congressional intent is clear, "that is the

---

[15] 5 U.S.C. § 706.

[16] *Buffalo Marine Services, Inc. v. U.S.,* 663 F.3d 750, 753 (5th Cir. 2011) (citations omitted).

[17] 467 U.S. 837 (1984).

[18] *Id.* at 842.

end of the matter."[19]  If, however, the statute is silent or ambiguous with regard to the specific issue, the question then becomes whether agency action is "based on a permissible construction of the statute."[20]  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[21]  Indeed, the Court cannot substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[22]

## LAW AND ANALYSIS

Plaintiffs make four arguments in support of their contention that this Court should invalidate Amendment 40.  First, they argue that the MSA prohibits the Gulf Council from regulating charter/headboat fishing separately from other recreational fishermen.  Second, they argue that the Gulf Council and the NMFS failed to adequately "assess, specify, and analyze" the likely economic and social effects of Amendment 40.  Third, they argue that Amendment 40 makes an unfair and inequitable allocation of fishery resources in violation of National Standard 4.  Finally, they argue that Amendment 40 makes an improper delegation of the Council's authority by authorizing the

---

[19] *Id.* at 843.
[20] *Id.* at 843–44.
[21] *Id.*
[22] *Id. at 844.*

8

NMFS staff to set final allocation levels.  The Court will address each of these arguments in turn.

## I. Amendment 40 Does Not Violate the Act by Regulating Charter/Headboat Fishermen Separately From the Remainder of the Recreational Sector.

As previously noted, Gulf red snapper are specifically addressed in the MSA.  It states, in relevant part, that the Gulf Council shall "establish separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing) and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year."[23] Plaintiffs' argue that this specific language precludes further separation of the enumerated red snapper sectors.  They aver that Amendment 40, by separating the federal for-hire sector from the remainder of the recreational sector, in effect impermissibly creates three sectors.

In support of their argument, Plaintiffs rely on two principles of statutory construction: *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of another) and the principle that a specific statute controls over a more general statute.  Because Congress has dictated that red snapper must be divided into sectors for recreation and commercial fishing, Plaintiffs assert that the Gulf Council and the NMFS are precluded from establishing a third quota for federal charter fishermen.  They argue that

_____

[23] 16 U.S.C. § 1883(d).

the decision to separate the recreational sector into two components is not entitled to deference under the *Chevron* standard because Congress has directly spoken to the question at issue. They further assert that the reference to the federal for-hire and recreational quotas as "components" of the overall recreational "sector" is naught more than semantics designed to mask the fact that they have impermissibly created a third sector.

Defendants' Motion argues that Amendment 40 is consistent with the MSA because it "does not alter the existing, overall recreational quota that, when reached, results in a prohibition on the retention of fish caught for the remainder of the fishing year." They argue that the division of the recreational sector into a federal for-hire component and a private angling component is merely a method to help insure that the recreational fishermen remain within their quota, and note that once the total recreational quota is reached all recreational harvest of red snapper in federal waters will be prohibited regardless of whether one component has remaining allocation. They note that the statute does not prohibit the establishment of sub-quotas, nor does it dictate the methods the NMFS may employ to ensure that the sectors remain within their quotas. They argue that Amendment 40 is within the broad discretion of the Council and the Secretary to "establish specified limitations which are necessary and appropriate for the conservation and management of the fishery . . . ."[24] Intervenors join in these arguments.

---

[24] 16 U.S.C. § 1853(b)(3).

The Court is bound to apply the *Chevron* standard in resolving this dispute. First, the Court must look to whether Congress has *directly* spoken to the issue at hand.[25] Plaintiffs vehemently argue that the Acts language dictating that there be separate quotas for recreational (which shall include charter) and commercial fisherman serves as a ban on further subdivision of the recreational quota. This Court disagrees. Although Section 407 of the Act dictates that the recreational sector "shall include charter fishing," it does not impose a facial prohibition on further subdivision of the recreational sector via the imposition of sub-quotas. Indeed, the MSA directs the Council to enact FMP measures that it deems "necessary and appropriate for the conservation and management of the fishery."[26] This empowering language represents a delegation of authority to the agency. Amendment 40 "does not change the fact that there is a total recreation quota or the requirement that the recreational sector be closed when that total quota is reached."[27] The final rule is clear that "if NMFS determines that the Gulf-wide recreational quota has been met, all recreational harvest of red snapper in the EEZ will be prohibited regardless of whether one component has remaining allocation."[28] Thus, despite Plaintiffs' arguments, it is apparent that there is a distinction between granting the federal for-hire fishermen their own, independently managed quota and the sub-quota system as established by Amendment 40. Whether the sub-quota is

---

[25] *Chevron*, 467 U.S. at 842.
[26] 16 U.S.C. § 1853 (a)(1)(A).
[27] 80 Fed. Reg. at 22427.
[28] *Id.*

referred to as a "component" or a "sector" is of no moment to the practical consequences of the rule.  Absent a facial prohibition, the Court must look to the second prong of the *Chevron* analysis.

The second prong of the *Chevron* analysis requires the Court to consider whether the action taken by the agency is based on a permissible construction of the statute.  Where, as here, Congress has specifically delegated to the agency the authority to promulgate regulations, agency actions may be overturned only if "they are arbitrary, capricious, or manifestly contrary to the statute."[29]  The Court's review is confined to this stringent standard.  It may not make policy decisions or substitute its judgment for the informed judgment of the agency.[30]

The Court cannot find that Amendment 40 is an arbitrary and capricious exercise of regulatory authority.  FMPs routinely set different sub-quotas based on various factors, and other courts have found this to be an appropriate exercise of authority under the Act.[31]  The Council has determined, after much study and comments from the public, that this division will aid in efficient management of the recreational sector.[32] The Federal Defendants' have clearly identified a rational basis for their decision to subdivide the recreational quota:

---

[29] *Chevron*, 467 U.S. at 844.

[30] *Id.* at 843–44.

[31] *See, e.g., Ctr. For Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 133 (D.D.C. 2013) (upholding temporal, geographic, and size-based sub-quotas for the Atlantic Bluefin tuna quota); *Ocean Conservancy v. Evans*, 260 F. Supp. 2d 1162, 1179 (M.D. Fla. 2003) (establishing sub-quotas within the commercial shark fishing quota according to species).

[32] See AR Doc. 230.

improved management of the recreational sector.  Plaintiffs have failed to point to facts established in the administrative record indicating that this decision is arbitrary and capricious.   Under *Chevron* and the APA, this decision is entitled to the deference of this Court, and Defendants are entitled to summary judgment in their favor on this claim.

## II.   The Gulf Council and NMFS Did Not Violate 16 U.S.C. § 1853(a)(9) and National Standard 8 by Failing to Assess, Specify, and Analyze the Likely Economic and Social Effects of Amendment 40

Plaintiffs next argue that Amendment 40 fails to comply with both National Standard 8 and 16 U.S.C. § 1853(a)(9).  National Standard 8 requires the NMFS to "take into account the importance of fishery resources to fishing communities by utilizing economic and social data," while 16 U.S.C. § 1853(a)(9) imparts a duty to "assess, specify, and analyze" the likely economic and social effects of a management plan or amendment, and include these findings in a Fishery Impact Statement ("FIS"). The national standards specifically indicate that "conservation and management measures shall be based upon the best scientific information available."[33]  Plaintiffs assert that 16 U.S.C. § 1853(a)(9) imposes a more powerful affirmative duty to collect and generate data on economic and social effects; however, they cite no law in support of this interpretation.  In pertinent part, this statute states that each proposed amendment shall:

---

[33] 16 U.S.C. § 1851(a)(2).

13

include a fishery impact statement for the plan or amendment . . . which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for--

**(A)** participants in the fisheries and fishing communities affected by the plan or amendment;

**(B)** participants in the fisheries conducted in adjacent areas under the authority of another Council, after consultation with such Council and representatives of those participants; and

**(C)** the safety of human life at sea, including whether and to what extent such measures may affect the safety of participants in the fishery;[34]

Courts have previously held that the requirements of 16 U.S.C. § 1853(a)(9) are "procedural, not substantive."[35] With regard to compliance with the National Standards, Courts have noted that the analysis of alternatives is subject to a rule of reason, as study could go on forever.[36] "By requiring that decisions be based on the best scientific information *available,* the Act acknowledges that such information may not be exact or totally complete."[37] "About the best a court can do is to ask whether the Secretary has examined the impacts of, and alternative to, the plan he ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable."[38]

---

[34] 16 U.S.C. § 1853.

[35] *City of New Bedford v. Locke,* No. 10-10789-RWZ, 2011 WL 2636863, at *6 (D. Mass. June 30, 2011) *aff'd sub nom. Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012).

[36] *Little Bay Lobster Co., Inc. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003).

[37] *Parravano v. Babbitt*, 837 F. Supp. 1034, 1046 (N.D. Cal. 1993) *aff'd,* 70 F.3d 539 (9th Cir. 1995).

[38] *Little Bay Lobster Co., Inc.*, 352 F.3d at 470.

"Absent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail."[39]

Defendants assert that they "undertook a qualitative analysis based on the best scientific information available."  Indeed, the final environmental impact statement includes a FIS as required by 16 U.S.C. § 1853(a)(9).[40]  This FIS outlines the available data and posits the economic and social effects of Amendment 40.  Importantly, Plaintiffs cannot point to any superior or contrary data in support of their arguments.  This fact points strongly in favor of a judgment in favor of Defendants on this argument.  Plaintiffs cite to only one case where a court found that the Secretary's analysis did not comply with National Standard 8.[41]  In that case, however, plaintiffs could point to specific, extant data that the Secretary ignored in analyzing the economic impacts of proposed agency actions.[42]  Here, Plaintiffs have pointed to no such data.

The Final Environmental Impact Statement at issue includes substantial background data on the red snapper fishery, including historic landings by state, licensure by state, and poverty rates by county.[43]  The Council also endeavored to gather input from Gulf Cost communities through

---

[39] *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007).

[40] AR Doc. 230 at 16351–56.

[41] *North Carolina Fisheries Ass'n, Inc., v. Daley*, 27 F. Supp. 2d 650, 661 (E.D. Va. 1998).

[42] *Id.*

[43] AR Doc. 230.

eight public hearings.[44]  After looking at this data, the Council gave its analysis on the conservation, economic, and social impacts of the Amendment, as required by law.  As to conservation, the Council found that the fishery would likely experience a reduction in discard mortality and a lower probability of overfishing.[45]  As to economic effects, the Council found that sector separation would likely result in "a more predictable season length, better business planning, and improvements to the economic performance of for-hire businesses."[46]  It further found that sector separation would provide increased management flexibility to implement measures designed to increase the economic benefits to each component.[47]  Finally, with regard to social effects, the NMFS stated that Amendment 40 would likely halt the decline in the proportion of landings from federally permitted for-hire vessels.[48]  The NMFS also noted the smaller quota allocated to recreational fishermen is offset by the fact that these individuals can, due to lengthy state seasons, pursue snapper fishing opportunities in state waters while federal waters are closed to them. The federal for-hire sector may not take advantage of state fishing opportunities.  Though these analyses are somewhat brief, the Court cannot, based on the deferential standard outlined in *Chevron*, substitute its own

---

[44] AR Doc. 230.
[45] AR Doc. 230 at 16289
[46] AR Doc. 230 at 16290.
[47] AR Doc. 230 at 16290.
[48] AR Doc. 230 at 16291.

judgment for that of the agency.[49]   Accordingly, Defendants and Intervenors are entitled to judgment in their favor on this claim.

**III. Amendment 40 Does Not Make an Unfair and Inequitable Allocation of Fishery resources in Violation of National Standard 4 by Favoring Federally Licensed Charter/Headboats Over Other Recreational Fishing Interests Without Comparing the Relative Harms and Benefits of the Decision**

Plaintiffs next argue that Amendment 40 violates National Standard 4 by dividing the recreational sector into separate components without measuring the impacts of the allocation on the affected groups.   National Standard 4 provides:

> (4)  Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.[50]

Plaintiffs argue that Amendment 40 violates this standard for three reasons. First, they argue that Amendment 40 is impermissible because it discriminates against recreational anglers without the requisite finding that the hardship to this group is outweighed by the total benefit to the red snapper fishery.

---

[49] *See Chevron*, 467 U.S. at 844.
[50] 16 U.S.C. § 1851.

Second, they argue that Amendment 40 is unlawful because it has the effect of discriminating between residents of different states.  Finally, they argue that the decision to average 2006–2013 catch numbers with 1986–2013 numbers in deciding the quota allocations was arbitrary and capricious.  The Court will address each of these arguments in turn.

## A. Discrimination Against Private Anglers

Plaintiffs first argue that Amendment 40 impermissibly discriminates against recreational anglers without the requisite finding that the hardship to this group is outweighed by the total benefit to the red snapper fishery.  Under applicable guidelines, the NMFS may make an allocation that imposes hardship on one group if that hardship is "outweighed by the total benefits received by another group or groups."[51]  Furthermore, "[a]n allocation need not preserve the status quo in the fishery to qualify as 'fair and equitable,' if a restructuring of fishing privileges would maximize overall benefits."[52] "[National Standard] 4's advisory guidelines provide that an allocation is 'fair and equitable' where it is 'justified in terms of the objectives of the FMP' and serves to 'maximize overall benefits.'  An allocation that meets these requirements is rarely deemed invalid."[53]

---

[51] 50 C.F.R. § 600.325 (c)(3)(i)(B).  *See also Loggren v. Locke*, 701 F.3d 5, 35 (1st Cir. 2012.).

[52] *Id.*

[53] *Lovgren v. Locke*, 701 F.3d 5, 35 (1st Cir. 2012) (citing 50 C.F.R. § 600.325(c)(3)(i)(A).-(B)).

18

Defendants contend that Amendment 40 complies with National Standard 4 in this respect. Indeed, contrary to Plaintiffs' assertions, Defendants do make the finding that the allocation is fair and equitable to all fishermen.[54] The final rule states that NMFS "determined that the allocation is fair and equitable because it reflects both historical changes in the recreational sector as well as current conditions, and is expected to increase the total benefits to the recreational sector."[55] It is apparent from the record that the detriment suffered by private anglers in the reduction of their federal season is offset by the fact that they may pursue snapper fishing opportunities in state waters.[56] As noted above, federally permitted for-hire fishermen are prohibited from taking advantage of these opportunities. The Council also found that sector separation allows for better management of the fishery by stabilizing the federal for-hire component's participation in the sector, increasing access of anglers who do not own vessels, creating a base for further management focused on maximizing opportunities for each component, reducing discard mortality, and reducing the likelihood or quota overages in the recreational sector.[57] Accordingly, this Court cannot find that the decision to allocate fish between the federal for-hire component and the private angling component was arbitrary and capricious in this regard, as the Council has provided a rational justification for its decision.

---

[54] 80 Fed Reg. at 22,425.
[55] *Id.*
[56] AR Doc. 230 at 16322.
[57] 80 Fed. Reg. at 22,425.

### B. Amendment 40 Does Not Impermissibly Discriminate Between Residents of Different States

Plaintiffs next argue that Amendment 40 is unlawful because it has the effect of discriminating against residents of different states. This argument is based primarily on the fact that charter fishermen holding federal for-hire permits are unevenly distributed across the Gulf Coast. Therefore, they argue, fishermen in states with fewer federally permitted charters are necessarily disadvantaged by these provisions.

Plaintiffs assert that "discriminatory effects are prohibited just as much as discriminatory intent." This contention is not, however, supported by applicable guidelines and case law. The guidelines define an allocation as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."[58] The guidelines make clear that "only those measures that result in direct distributions of fishing privileges will be judged against the allocation requirements of Standard 4."[59] Here, the "discrimination" between residents of different states complained of by Plaintiffs is merely incidental to the purpose and execution of Amendment 40. Amendment 40 makes no facial allocation between residents of different states.[60] Accordingly, because no state-based allocations have been made, National Standard 4 is not implicated in this regard.

---

[58] 50 C.F.R. § 600.325 (c)(1). *See also Little Bay Lobster Co., Inc. v. Evans* 352 F.3d 462, 469 (1st Cir. 2003).

[59] *Id.*

## C. Selection of Data Range Used to Calculate Quotas Was Not Arbitrary and Capricious

Plaintiffs finally contend that Defendants' choice to base the quota allocations on an average of the 2006–2013 catch numbers and the 1986–2013 numbers was arbitrary and capricious.  As long as it justifies its decision, the Council has discretion in selecting the appropriate data set upon which to base an allocation.[61]  The record before the Court indicates that the Gulf Council considered eight different allocation alternatives before making this decision.[62] The Council selected Alternative 7 as the preferred alternative "to balance the history of the recreational sector with more current conditions."[63]  The Council determined that allocations based solely on more recent years "did not capture changes that have occurred in the fishery, such as changes in regulations and disruptive events such as hurricanes and oil spills that have affected how recreational fishing is prosecuted."[64]  The Council has, therefore, provided a justification for its decision to include older data in making its allocations. Plaintiffs fail to carry their burden to show that this decision was arbitrary and capricious.

## IV. The Gulf Council Did Not Unlawfully Abdicate Its Decision-Making Authority By Approving Amendment 40 Without Setting Any Allocation Levels And By Delegating That Task to NMFS Staff

---

[61] *Fisherman's Finest, Inc. v. Locke*, 593 F.3d 886, 897 (9th Cir. 2010).

[62] AR Doc. 230 at 16317.

[63] AR Doc. 230 at 16555.

[64]  80 Fed. Reg at 22,429.

In their final claim, Plaintiffs argue that the Gulf Council improperly delegated its statutory authority to the NMFS staff by allowing the NMFS to set final allocation percentages without the Council's approval. The final allocation numbers were adjusted slightly after the Council approved Amendment 40 due to a calibration of Marine Recreational Informational Program (MRIP) landing estimates.[65] At the time of this approval, the Council was well aware of the ongoing workshop evaluating the methods to appropriately calibrate this data, and it was presented with the preliminary results of this workshop.[66] The Council approved the incorporation of this data into the final rule.[67] Accordingly, the Council delegated the task of setting final allocations according to the calibrated landing data, within a margin of plus or minus 3.3 percent of the allocations considered by the Council.[68] The final allocations set by NMFS were within 1.7 percent of those approved by the Council, well within this range.[69]

Plaintiffs contend that delegation violates the MSA because the NMFS does not have the power to change the substance of actions approved by the Council. They rely primarily on the case of *Fishing Company of Alaska, Inc. v. Gutierrez*.[70] There, the final rule promulgated by the NMFS included substantive enforcement provisions that the North Pacific Fishery

---

[65] AR Doc. 276 at 21991.
[66] AR Doc. 199 at 11067.
[67] AR Doc. 199 at 11070–11072.
[68] AR Doc. 199 at 11067.
[69] AR Doc. 230 at 16323.
[70] 510 F.3d 328 (D.C. Cir. 2007).

22

Management Council never adopted.[71]  Defendants contend that this case is inapplicable because the changes made by the NMFS were not substantive. This Court agrees.  The NMFS merely adjusted numbers consistent with the final MRIP data, as directed by the Council.  The final allocations were made pursuant to the approved formula and well within the approved range. Importantly, there is no evidence that the NMFS had any discretion to determine these final allocations; it merely mechanically applied the formula approved by the Council.  Accordingly, there has been no improper delegation of authority to set the final allocation percentages.

## CONCLUSION

For the foregoing reasons, Plaintiffs Motion for Summary Judgment is DENIED, Defendants' Motion for Summary Judgment is GRANTED, and Defendant Intervenor's Motion for Summary Judgment is GRANTED.

New Orleans, Louisiana this 4th day of January, 2016.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

---

[71] *Id.* at 332–33.